**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

PATRIOT COAL SALES LLC,

        Plaintiff,

v.                                   CIVIL ACTION NO. 2:12-cv-03653

BRIDGEHOUSE COMMODITIES
TRADING LIMITED, et al.

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the defendant Bridgehouse Capital Limited's Motion to Dismiss [Docket 8] for lack of personal jurisdiction and the defendant Sentrum Holdings Limited's Motion to Dismiss [Docket 31] for lack of personal jurisdiction. The Court **FINDS** that it does have personal jurisdiction over both defendants and **DENIES** the Motions.

**I.    Background**

This Motion arises from breach of contract, fraud, and estoppel claims brought by the supplier of coal against the purchaser and two corporations affiliated with the purchaser that supplied a comfort letter[1] to the supplier.

In April of 2011, representatives of Bridgehouse Commodities Trading Limited ("Bridgehouse Commodities") and Bridgehouse Capital Limited ("Bridgehouse Capital") approached Patriot Coal Sales LLC ("Patriot") about purchasing coal from the West Virginia mines of a Patriot affiliate. (Decl. of B. Reynolds [Docket 21, Exhibit 1], at ¶ 3). The purchasing

---

[1]    In general, "a comfort letter is an instrument written by a third party and is designed to encourage the creation of an agreement between two other parties." *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, 2003 WL 21671812, at *6 (S.D.N.Y. 2003) (citing Herbert Bernstein and Joachim Zekoli, *The Gentleman's Agreement in Legal Theory and Modern Practice*, 46 Am. J. Comp. L. 87, 98–101 (1998)).

entity was to be Bridgehouse Commodities. (*Id.*) Patriot is, and at all relevant times was, a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri and with offices in Charleston, West Virginia. Bridgehouse Commodities is, and at all relevant times was, a corporation organized and existing under the laws of the Isle of Man, with offices in London, England and Doha, Qatar. Bridgehouse Capital is, and at all relevant times was, a corporation organized and existing under the laws of England and Wales with a principal place of business in London, England.

Between April 2011 and September 2011, negotiations took place between Bridgehouse representatives and Beverly Reynolds, a Vice President of Patriot. (*Id.* at ¶¶ 2–4). Beverly Reynolds works at Patriot's Charleston, West Virginia offices. (*Id.*) One of the main negotiators for Bridgehouse Commodities and Bridgehouse Capital was Donald Jordan. [Docket 21, Exhibit 1, Exhibit A]. Donald Jordan's documented emails identify him as being associated with Bridgehouse Capital. (*Id.*) By early September 2011, the business points of the coal purchase agreement had largely been settled and memorialized in a contract referred to as a confirmation agreement (the "Confirmation"). (Decl. of B. Reynolds [Docket 21, Exhibit 1], at ¶ 7). The Confirmation detailed the various terms and conditions of the sale to Bridgehouse Commodities. (*Id.*) During the negotiation process, Donald Jordan emailed revisions of the draft Confirmation to Beverly Reynolds. (*Id.*)

In the Confirmation, Bridgehouse Commodities agreed to purchase hundreds of thousands of tons of coal a year from Patriot over a multiyear period. [Docket 60, Exhibit 1, Confirmation, at 1]. The contract value of the coal was between $50 million and $100 million dollars. (*Id.*) The Confirmation specified that coal would be from a West Virginia mine and would be loaded onto barges on the Kanawha River in West Virginia. (*Id.* at 1–2). Bridgehouse

Commodities agreed to take title to the coal when it was loaded on the barges in West Virginia. (*Id.* at 5).

Donald Jordan signed the Confirmation on Bridgehouse Commodities' behalf on September 16, 2011, in his capacity as "Managing Director" of Bridgehouse Commodities. (*Id.* at 4). Patriot, however, would not execute the Confirmation until it received credit information from Bridgehouse Commodities. [Docket 21, Exhibit 1, at ¶ 8]. Addressing Patriot's concern about Bridgehouse Commodities ability to pay, Bridgehouse Capital offered that it and Sentrum Holdings Limited ("Sentrum"), an affiliated entity organized under the laws of the British Virgin Islands, would support Bridgehouse Commodities with a comfort letter (the "Comfort Letter"). (*Id.* at ¶ 11). The Comfort Letter, along with nonpublic financial information from Sentrum, was emailed to Carol Damba in Patriot's St. Louis, Missouri office and Beverly Reynolds in Patriot's Charleston, West Virginia office. (*Id.* at ¶ 9). Robert Bennett, President of Patriot, executed the Confirmation on the same date Patriot received the Comfort Letter, October 27, 2011, in his Charleston, West Virginia office. [Docket 21, Exhibit 2, at ¶ 8; Docket 60, Complaint, at ¶ 14].

In January 2012, Patriot contends, persons representing the Bridgehouse entities (it is unclear which entity specifically) traveled to West Virginia to view the barge operations where the coal Bridgehouse Commodities was to purchase was to be loaded. [Docket 21, Exhibit 1, at ¶ 12]. Bridgehouse Commodities never took any coal as required under the Confirmation. (*Id.* at ¶ 13). Beverly Reynolds had multiple email and telephone communications with Donald Jordan regarding Bridgehouse Commodities' failure to take coal. (*Id.*) Patriot also contends that Donald Jordan traveled to Charleston, West Virginia on February 16, 2012 to discuss Bridgehouse Commodities' failure to abide by the Confirmation with Robert Bennett. (*Id.* at ¶ 14);[Docket 21, Exhibit 2, at ¶ 10].

The Comfort Letter provides that "[s]o long as any indebtedness of [Bridgehouse Commodities] to Patriot [] under the Agreement or otherwise remains outstanding and unpaid, [Sentrum and Bridgehouse Capital] represent and warrant to Patriot [] that: [Sentrum and Bridgehouse Capital] are affiliated with [Bridgehouse Commodities] and will maintain affiliation and effective control of [Bridgehouse Commodities]. . . ." [Docket 60, Ex. 2, at 1]. The Comfort Letter also provides covenants from Sentrum and Bridgehouse Capital to Patriot, namely that:

    a.  [Bridgehouse Commodities] will be adequately capitalized and funded to ensure that [Bridgehouse Commodities] is able to meet its obligations to Patriot [], as well as [Bridgehouse Commodities'] other creditors;

    b.  [They will] [c]ause [Bridgehouse Commodities] to take such actions as are needed to meet its payment and other financial obligations owed to Patriot [];

    c.  [They will] [c]ause [Bridgehouse Commodities] to take such corporate actions as are needed to perform and observe all of the terms, covenants and conditions of the [Confirmation] and any other agreements and extensions of credit made by Patriot [] to [Bridgehouse Commodities]; and

    d.  [Bridgehouse Commodities] shall take such actions as are needed to maintain its corporate existence and to operate and maintain its current lines of business.

(*Id.* at 2). The comfort letter is signed by Andrew J. Ruhan, who according to this letter is the "Chairman & CEO" of Sentrum and Bridgehouse Capital. (*Id.*)

## II.    Legal Standard

When a court's personal jurisdiction over a defendant is challenged under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden to prove grounds for jurisdiction by a

preponderance of the evidence. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993)). When a pretrial personal jurisdiction motion is decided without conducting an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Id.* (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). In deciding whether the prima facie showing has been met, "the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Id.* (citing *Mylan Labs.*, 2 F.3d at 60).

Among other limited scenarios, a federal court may exercise personal jurisdiction over a defendant who has been served a summons or filed a waiver of service and "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). To determine whether a defendant is subject to the jurisdiction of a state court of general jurisdiction, two conditions must be met. First, the exercise of jurisdiction must be authorized under the state's long-arm statute. *Carefirst*, 334 F.3d at 397 (citing *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001)). Second, the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Id.* Because West Virginia's long-arm statute, W. Va. Code § 56-3-33, has been interpreted to be coextensive in scope with the full reach of due process, the statutory inquiry merges with the due process inquiry. *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997).

The due process inquiry requires a court to determine whether the defendant has purposely established "minimum contacts" with the forum state such that it would not "offend traditional notions of fair play and substantial justice" to maintain the suit. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Fourth Circuit has provided a framework for assessing whether a federal court's

assertion of personal jurisdiction satisfies due process. The framework requires a district court to consider three factors: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir. 2002)).

### III.    Analysis

In Count II of its Complaint, Patriot alleges that Sentrum and Bridgehouse Capital are liable to it for breach of contract for failing to cause Bridgehouse Commodities to "meet its payment and other financial obligations to Patriot," "perform and observe all of the terms, covenants and conditions of the Confirmation," and "maintain and operate its current line of business" as covenanted in the Comfort Letter. [Docket 60, Complaint, at ¶ 32]. In Count III, Patriot alleges fraud against all of the defendants for making materially false statements in the Comfort Letter upon which Patriot justifiably relied. (*Id.* at ¶¶ 34–43). Based on these same allegations, Patriot alleges claims for promissory estoppel and equitable estoppel in Counts IV and V, respectively. (*Id.* at ¶¶ 44–55).

### A.  First Prong: Purposeful Availment

The first prong of the personal jurisdiction analysis requires the court to determine the "extent to which the defendant purposefully availed itself of the privilege of conducting activities in [West Virginia]." *Consulting Engineers*, 561 F.3d at 278.

In the business context, there are several non-exclusive factors that courts look to in determining purposeful availment. *Id.* Among these factors is "whether the performance of

6

contractual duties was to occur within the forum." *Id.* (citing *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982)). Assuming Bridgehouse Capital and Sentrum had a duty to cause Bridgehouse Commodities to "take such corporate actions as are needed to perform and observe all of the terms, covenants and conditions of the Confirmation" and taking the undisputed fact that the Confirmation requires Bridgehouse Commodities to take title to West-Virginia-mined coal in West Virginia, then the ultimate result of the contractual duty was to occur within West Virginia. Further supporting this conclusion, the Comfort Letter warrants that both Bridgehouse Capital and Sentrum will maintain "effective control" over Bridgehouse Commodities. [Docket 60, Ex. 2, at 1]. Bridgehouse Capital and Sentrum represented that they could control an entity that had contractual duties in West Virginia, and they assured Patriot that they would use that control to ensure those duties were performed.  Therefore, this factor suggests the activities of Bridgehouse Capital and Sentrum meet the purposeful availment requirement.

This reasoning, in conjunction with the allegation of fraud, also supports jurisdiction under the "effects test" promulgated by the United States Supreme Court. *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (holding that jurisdiction in California was proper because defendants' intentional conduct in Florida was calculated to cause injury to plaintiff in California). The calculated effect of Bridgehouse Capital and Sentrum's alleged fraudulent promise to cause Bridgehouse Commodities to take title to coal in West Virginia was that Patriot would be left with unsold coal in West Virginia.

Continuing with the Fourth Circuit analysis, defendant Jordan sent numerous emails to Beverly Reynolds concerning both the Confirmation and the Comfort Letter. Based on the present record, his email address and the signature block of his emails suggest that he is an

7

employee of Bridgehouse Capital.[2] It is reasonable to infer based on the content of these emails that Donald Jordan was an agent of Bridgehouse Capital and Sentrum, and he acted on their behalf during the negotiations of the Confirmation and the Comfort Letter.

In regard to the Comfort Letter, this Court **FINDS** for the purposes of this Motion that Jordan was acting on Bridgehouse Capital and Sentrum's behalf in sending the letter to Patriot's offices in Charleston, West Virginia and St. Louis, Missouri. Furthermore, the disputed fact as to whether any Bridgehouse Capital employee ever made in-person contact with Patriot in West Virginia is resolved in favor of Patriot's contention that Donald Jordan came to West Virginia to discuss the failure to take or pay for coal under the Confirmation with Patriot's President. This factor further supports this Court's personal jurisdiction over Bridgehouse Capital. *See Consulting Engineers*, 561 F.3d at 278 (stating as a factor in purposeful availment "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship").

Bridgehouse Capital and Sentrum knew that the essential terms of the Confirmation were to take place in West Virginia, and the Comfort Letter they executed was assuring the Confirmation would be honored. The Comfort Letter was given as consideration to induce Patriot to sign the Confirmation.[3] Bridgehouse Capital and Sentrum were on notice that litigation would likely take place in West Virginia if Bridgehouse Commodities breached the Confirmation. Thus, this Court's jurisdiction over Bridgehouse Capital and Sentrum is not solely

---

[2]    The record shows that Donald Jordan's email address is "djordan@bridgehousecapital.com" and his signature block contains "Bridgehouse Capital Ltd." under his name. [Docket 21, Ex. 1, Ex. A].

[3]    Bridgehouse Capital itself admits "[t]he sole purpose of the Comfort Letter was to induce Patriot to make [the] coal shipments on credit to [Bridgehouse] Commodities . . . ." [Docket 29, at 4].

a result of their "'random,' 'fortuitous,' or 'attenuated'" contacts with West Virginia. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted).[4]

Case law on the issue of comfort letters establishing personal jurisdiction is scarce. For the purposes of this Motion, the analogy of comfort letters to guarantees is an apt one for determining purposeful availment because a comfort letter could be construed as a guaranty in certain circumstances. Commentators have recognized that "the enforceability of a comfort letter depends on a number of factors" and the "intent on the part of the drafter to be bound as a guarantor is likely to be found if the instrument, despite the fact that it calls itself a 'comfort letter,' contains operative language such as 'guaranty,' 'contract' or other words of promise." *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, 2003 WL 21671812, at *6 (S.D.N.Y. 2003) (citing Herbert Bernstein and Joachim Zekoll, *The Gentleman's Agreement in Legal Theory and Modern Practice*, 46 Am. J. Comp. L. 87, 98–101 (1998)).

In *State Bank of Alleghenies v. Hudnall*, No. 94-1809, 62 F.3d 1415 (4th Cir. 1995) (unpublished), the Fourth Circuit held that personal jurisdiction existed over a guarantor who was not a resident of Virginia. *Id.* at *3. The defendant challenging personal jurisdiction in *Hudnall* was a Georgia resident who guaranteed a loan for his brother. *Id.* at *1. The loan was obtained from a non-resident bank to finance the brother's dry cleaning business in Virginia. *Id.* In finding personal jurisdiction over the guarantor defendant, the court recognized as part of the calculus that "the guarantor and the in-state borrower shared a close familial bond [that] at least posed the potential that the guarantor stood to gain from his sibling's business success." *Id.* at *2.

---

[4]     In regard to the Confirmation, if it truly was Bridgehouse Capital negotiating on behalf of Bridgehouse Commodities it would suggest that Bridgehouse Commodities' corporate form was not being respected—supporting a corporate veil piercing theory. *See Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 98–99 (W. Va. 1986) (providing factors under West Virginia state law for a corporate veil piercing analysis, including the "disregard of legal formalities and failure to maintain proper arm's length relationships among related entities"). It is not necessary, however, to analyze this other potential route to this Court exercising personal jurisdiction over Bridgehouse Capital as personal jurisdiction exists on other grounds.

It recognized that the brother "acted with at least apparent authority as [the defendant's] agent," and that the defendant "provided his financial statement for the Virginia bank's consideration, and ultimately signed a Virginia loan guaranty for a Virginia business." *Id.* The court found these to be sufficient contacts between the guarantor and Virginia to meet the requirements of personal jurisdiction. *Id.*

In the present case, Bridgehouse Captial, Sentrum, and Bridgehouse Commodities are affiliated entities and in a corporate sense could be said to share a "familial bond." As affiliates, Bridgehouse Capital and Sentrum would certainly stand to gain from Bridgehouse Commodities' success. Through a Bridgehouse representative, Sentrum provided Patriot with its nonpublic financial statements. Although Patriot is not a West Virginia business, the Comfort Letter did more than seek to assure Patriot that Bridgehouse Commodities would meet its financial obligations as the agreement in *Hudnall* did. The Comfort Letter also provided Patriot with what could be construed as an assurance by Bridgehouse Capital and Sentrum of Bridgehouse Commodities' performance—performance that would take place in West Virginia. This essential factor, along with the reasoning in *Hudnall*, convinces this Court that the purposeful availment requirement has been met.

Such a conclusion is also in accord with this district's recent decision in *HSBC Bank USA, Nat'l Ass'n v. Resh*, 2012 WL 2601910 (S.D. W. Va. 2012) (C.J. Chambers) in which personal jurisdiction was held to exist over out-of-state guarantors of loans which were provided to certain trusts for the purpose of purchasing property in West Virginia. *Id.* at *3. Critical to the Court's reasoning in *HSBC Bank* were the reasonable inferences that the trusts "would not have been able to secure financing for the properties without the guarantees . . ., that the profits anticipated by the [trusts] would benefit the [guarantors], and that the [guarantors] guaranteed the

notes in anticipation of those benefits." *Id.* Here, it is reasonable to infer that Patriot would not have entered the Confirmation without the Comfort Letter, that the profits from the use or resale of the coal would benefit Sentrum and Bridgehouse Capital as entities affiliated with Bridgehouse Commodities, and that the Comfort Letter was provided in anticipation of those benefits. *Accord Nat'l Can Corp. v. K Beverage Co.*, 674 F.2d 1134, 1137 (6th Cir. 1982) ("[T]he guaranties, when signed by a person with an economic interest in the corporation, furnished the necessary minimum contacts.").

## B.  Second Prong: Specific Jurisdiction

The second prong of the analysis requires a court to determine "whether the plaintiff['s] claims arise out of those activities directed at the State." *Consulting Engineers*, 561 F.3d at 278. Neither party contends, nor does the record support, a claim of general jurisdiction over Bridgehouse Capital or Sentrum. This prong of the analysis, however, supports a finding of specific jurisdiction if the claims in the Complaint arise out of the activities determined to be directed at West Virginia under the first prong. *Id.*

Patriot's breach of contract claim against Bridgehouse Capital and Sentrum is directly related to the Comfort Letter whose representation of effective control of Bridgehouse Commodities and covenant to ensure performance under the Confirmation are directed at the State of West Virginia. Likewise, the fraud and estoppel claims arise out of the same promises provided to Patriot in the Comfort Letter. Furthermore, Donald Jordan visited West Virginia to speak with Patriot's President about Bridgehouse Commodities' failure to take coal under the Confirmation. As already discussed, the Confirmation was tied to Bridgehouse Capital and Sentrum's promises under the Comfort Letter. For the foregoing reasons, this Court **FINDS** that the claims do arise out of Bridgehouse Capital and Sentrum's activities directed at the State.

### C.  Third Prong: Reasonableness under the Constitution

The third prong of the analysis requires a court to determine "whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Engineers*, 561 F.3d at 278. In making this determination, relevant factors include: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering social policies." *Id.* at 279 (citations omitted).

Here, although Bridgehouse Capital and Sentrum are not incorporated in the United States and their principal places of business are in London, England, some court in the United States will have jurisdiction over the company with respect to ruling on the enforceability of the Comfort Letter. Therefore, the burden relative to litigating in any other state is small.

West Virginia has an interest in adjudicating the enforceability of a comfort letter purporting to ensure performance under another contract whose essential obligations were to occur within the State's borders. The record shows that the Comfort Letter was critical to Patriot's willingness to enter the Confirmation. The effect comfort letters have on parties doing business within the State's borders is ample reason for the State to take an interest in their enforceability.

The plaintiff has a clear interest in obtaining relief in this forum. Bridgehouse Commodities has consented to personal jurisdiction and the factual issues and legal determinations in the breach of contract claim against it will be closely tied to the factual issues and legal determinations in the claims against Bridgehouse Capital and Sentrum. This reasoning

also illustrates the efficiency obtained in litigating the dispute against Bridgehouse Capital and Sentrum in this forum.

This Court **FINDS** that exercising jurisdiction over Bridgehouse Capital and Sentrum would be constitutionally reasonable.

**IV.    Conclusion**

For the foregoing reasons, the plaintiff has satisfied its burden of proving this Court's jurisdiction over defendants Bridgehouse Capital and Sentrum. Therefore, the Court **DENIES** Bridgehouse Capital's Motion to Dismiss and **DENIES** Sentrum's Motion to Dismiss. The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:      February 8, 2013

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE